GEORGE et al. v. WALLACE et al. BROWNLEE et al. v. SAME. MORSMAN v. SAME. POPPLETON v. SAME. MORTON et al. v. SAME. McCAGUE INV. CO. et al. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. December 8, 1904.)

Nos. 1,954–1,959.

1. FEDERAL COURTS—JURISDICTION—DIVERSITY OF CITIZENSHIP.

Where a national bank executed a nonnegotiable note to another national bank, both being citizens of Nebraska, which note was assigned to a citizen of another state, an action by him thereon against the maker and other defendants, the most of whom were also citizens of Nebraska, cannot be maintained in the federal courts on the ground of diversity of citizenship.

[Ed. Note.—Diverse citizenship as a ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. SAME—STATUTES—REPEAL.

Act Cong. June 30, 1876, c. 156, § 2, 19 Stat. 63 [U. S. Comp. St. 1901, p. 3509], giving federal courts original jurisdiction in equity of a creditors' bill against stockholders of a national bank having gone into liquidation, as authorized by Rev. St. § 5220 [U. S. Comp. St. 1901, p. 3503], was not repealed by Act July 12, 1882, c. 290, § 4, 22 Stat. 163 [U. S. Comp. St. 1901, p. 3458], providing that the jurisdiction for suits by or against any national bank, except suits between them and the United States, shall be the same as the jurisdiction for suits by or against state banks, nor by Act Aug. 13, 1888, c. 866, § 4, 25 Stat. 436 [U. S. Comp. St. 1901, p. 514], declaring that all national banks, for the purpose of actions by or against them, shall be deemed citizens of the states in which they are respectively located, etc., as such latter sections relate exclusively to suits by or against banking associations themselves.

3. SAME.

A suit which may be brought in a federal Circuit Court by or against a citizen of a state, because it arises under Constitution, laws, or treaties of the United States, may, for the same reason, be brought in such court by or against a national bank located in the same state, notwithstanding Act Cong. July 12, 1882, c. 290, § 4, 22 Stat. 163 [U. S. Comp. St. 1901, p. 3458], providing that the jurisdiction for suits hereafter brought by or against any national bank, except suits between them and the United States, etc., shall be the same and not other than the jurisdiction for suits by or against state banks, etc.

**4. SAME—CREDITORS' SUIT.**

An action by a citizen of another state on an assigned nonnegotiable note of a national bank which had gone into voluntary liquidation to subject assets to the payment thereof, and to enforce the liability of stockholders, was properly brought in the federal Circuit Court, in so far as the enforcement of the stockholders' liability was concerned, under Act Cong. June 30, 1876, c. 156, § 2, 19 Stat. 63 [U. S. Comp. St. 1901, p. 3509], providing that when any national banking association shall have gone into liquidation under Rev. St. § 5220 [U. S. Comp. St. 1901, p. 3503], the individual liabilty of stockholders may be enforced by a bill in the nature of a creditors' bill in the federal Circuit Court.

**5. SAME—SUIT TO ADMINISTER ASSETS.**

A suit against an insolvent national bank which has gone into voluntary liquidation to enforce a specific lien, or to enforce and judicially administer a trust previously created by contract, or arising from the insolvency and liquidation proceedings, is a suit arising under the laws of the United States, within the jurisdiction of the federal Circuit Court, as prescribed by Act Cong. Aug. 13, 1888, c. 866, § 1, 25 Stat. 434 [U. S. Comp. St. 1901, p. 514], and expressly excepted from the provisions of section 4 (25 Stat. 436) thereof.

**6. SAME—TRUST FUNDS.**

The tangible assets and the liability of stockholders of an insolvent national bank in process of voluntary liquidation in the hands of the liquidating agent is a trust fund for the primary benefit of creditors.

**7. SAME—CREDITORS' SUIT—BILL—MULTIFARIOUSNESS.**

A creditors' bill by one or more creditors of an insolvent national bank in process of voluntary liquidation, on behalf of all, to wind up the affairs of the bank, and to obtain a complete judicial administration of its affairs, involving an ascertainment of claims against it, the enforcement of trusts in respect to assets and capital stock, and for distribution of the proceeds, is not multifarious.

**8. SAME—CAPACITY TO SUE—NECESSITY OF JUDGMENT.**

All of the assets of an insolvent national bank in process of voluntary liquidation having been placed in the hands of a defendant, who, by express contract, was constituted a trustee for the primary benefit of another national bank, which became a creditor of the liquidating bank by the assumption and payment of the demands of all of the other creditors of the liquidating bank, complainant, the holder of the note executed by the liquidating bank as a part of the assumption contract sued to enforce an asserted lien by way of pledge on all of the undisposed assets of the liquidating bank, to obtain a judicial administration of its affairs, and to enforce the statutory obligation of stockholders. *Held*, that it was no objection to complainant's capacity to sue that his claim had not been reduced to judgment.

**9. SAME—TRUSTS.**

Where the insolvency of a national bank was accompanied by a conveyance of its assets to a trustee, and a pledge thereof for the benefit of creditors, and this was followed by affirmative proceedings in liquidation, authorized by law, and the selection by the shareholders of the same trustee as their liquidating agent, such agent held the assets under an express trust for the benefit of creditors.

**10. SAME—ULTRA VIRES ACTS—RIGHT TO PLEAD.**

Where a contract by which a national bank assumed all the obligations of an insolvent bank in contemplated liquidation was fully explained at a meeting at which 1,665 out of 2,000 shares were represented, and after the contract was executed it was ratified by a vote exceeding the proportion of stock specified by Rev. St. §§ 5220, 5221 [U. S. Comp. St. 1901, p. 3503], the stockholders were not thereafter entitled to claim that such contract was ultra vires.

**11. SAME—LIABILITY OF STOCKHOLDERS—DEBTS.**

Where a national bank assumed the debts of an insolvent bank contemplating liquidation, in consideration of a transfer of certain of the bank's available assets, and certain notes for the balance, such notes represented the "contracts, debts, and engagements" of the insolvent bank in equity, for which its stockholders were liable, as provided by Rev. St. § 5151 [U. S. Comp. St. 1901, p. 3465].

[Ed. Note.—Enforcement of statutory liability of stockholders in national banks, see note to Williamson v. American Bank, 52 C. C. A. 6.]

**12. SAME—APPEAL—ASSIGNMENTS OF ERROR.**

An objection to the computation of interest on claims against an insolvent bank in process of liquidation cannot be reviewed on appeal, where it was not made the subject of an assignment of error.

Appeals from the Circuit Court of the United States for the District of Nebraska.

These are appeals from a decree of the Circuit Court of the United States for the District of Nebraska enforcing the liability of the appellants as shareholders of the American National Bank of Omaha. In December, 1895, the managing officers of that bank anticipated the withdrawal, about the first of the following year, of a large amount of deposits. The condition of the bank was such that it had not available funds sufficient to meet the expected demands and to thereafter continue in business and comply with the requirements of the national banking act. Consequently on December 21, 1895, a contract was entered into with the Union National Bank of the same city, the terms of which, so far as need be recited, are as follows: The Union National assumed the payment of the liabilities of the American National to its depositors and on account of bills payable, and in return was to receive its cash, cash items, and such bills receivable as the former was willing to accept at par and without recourse. The difference between the aggregate of the amounts so received and the gross amount of liabilities assumed was to be represented by three nonnegotiable promissory notes of the American National, the payment of which was to be secured by a pledge of all of its remaining assets to Thomas L. Kimball as trustee. This contract was carried out. The Union National moved into and took possession of the quarters of the retiring bank. It was ascertained that the total indebtedness of the American National on account of deposits, demand and time certificates and bills payable, which were assumed by the Union National, amounted to $289,097.30; that the cash, cash items, and bills receivable taken without recourse by the Union National aggregated $88,097.30; that a balance of $201,000 remained. To evidence this balance the president and cashier of the American National executed to the Union National three nonnegotiable promissory notes, each for $67,000, payable, respectively, in one, two, and three years from their date, December 23, 1895. In accordance with the contract the remaining assets of the American National were placed in the hands of Thomas L. Kimball, the president of the American National, as trustee for the contracting parties and for the protection of their respective rights under the contract. Kimball as trustee retained possession and controlled the collection of them until his death, which occurred during the pendency of the complainant's suit, when his successor, James Burness, was appointed and thereafter continued in the performance of the trust duties. The assets which were pledged to the Union National, although of large amount in face value, were found to be of little actual worth. The execution of the contract of December 21, 1895, by the president and cashier of the American National, was directed by resolution of the board of directors of that bank. On January 14, 1896, an annual meeting of the shareholders of that bank was held, at which were represented 1,665¾ shares out of a total of 2,000. At this meeting a resolution was adopted instructing the directors to take action looking to the liquidation of the bank. On February 25, 1896, another meeting of the shareholders was held, at which were represented 1,696 shares, and at which a resolution for the voluntary liquidation of the bank was adopted by an affirmative vote of 1,639¾ shares. Thomas L. Kimball, theretofore appointed as trustee

of the remaining assets of the bank, by the contract of December 21, 1895, was designated in the resolution as the agent and trustee of the shareholders in the liquidation proceedings. All of the subsequent proceedings provided by law for voluntary liquidation were thereupon duly adopted. The Union National fulfilled its obligations under the contract, having taken up the liabilities assumed by it. It being found that the trustee was meeting with little success in the collection of the assets, and that the principal of the note first maturing had been but slightly reduced, this suit was instituted August 8, 1898, by Sumner Wallace, a citizen of New Hampshire, as the assignee of the note, against the Union National, Thomas L. Kimball, trustee, and the American National and its stockholders, including the appellants. By an amended bill the complainant sought, on behalf of himself and all of the other creditors of the American National, the winding up of the affairs of that bank, the determination of the amount due him upon his note, the subjection of the remaining assets to the payment of his claim, the ascertainment of all of the creditors and the amounts of their claims, and the enforcement of the liability of the stockholders. The complainant had not reduced his note to judgment prior to the institution of the suit. During the progress of the suit the uncollected assets were sold by order of the court and the proceeds accounted for. Upon final hearing a decree was entered ascertaining the amounts due the complainant and the Union National after the application of all credits, the number of shares of stock held by each shareholder of the Americal National, and against each defendant shareholder for $97.23 per share of stock held by him. The amount of the recovery was appropriately apportioned between the two creditors. From this decree the appeals were prosecuted.

W. W. Morsman, Howard B. Smith, and Richard S. Horton, for appellants.

R. S. Hall (J. H. McCulloch and James H. Macomber, on the brief), for appellees.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The complainant, a citizen of New Hampshire, sued as the assignee of a nonnegotiable promissory note. His assignor, the payee of the note, is a national bank located in the state of Nebraska, and is therefore to be deemed a citizen of that state so far as concerns the question of jurisdiction. Most of the appellants are also citizens of Nebraska. This being so, some ground of federal jurisdiction other than diversity of citizenship must be found to exist to justify the maintenance of the suit against them. May it be found in the provisions of the acts of Congress relating to cases for the winding up of the affairs of national banking associations and to enforce the liability of shareholders of such associations as may have gone into voluntary liquidation? It is obvious that any case of such a character would be one arising under the laws of the United States of which, in the absence of some specific limitation of the general grant of jurisdiction, a Circuit Court would have cognizance irrespective of the citizenship of the parties.

The statutes which are pertinent to this question are as follows:

"Any [national banking] association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock." Section 5220 Rev. St. [U. S. Comp. St. 1901, p. 3503].

"That when any national banking association shall have gone into liquidation under the provisions of section five thousand two hundred and

twenty of said statutes, the individual liability of the shareholders provided for by section fifty-one hundred and fifty-one of said statutes may be enforced by any creditor of such association by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association, against the shareholders thereof, in any court of the United States having original jurisdiction in equity for the district in which such association may have been located or established." · Act of June 30, 1876, c. 156, § 2, 19 Stat. 63 [U. S. Comp. St. 1901, p. 3509].

"That the jurisdiction for suits hereafter brought by or against any association established under any law providing for national banking associations, except suits between them and the United States, or its officers and agents, shall be the same as, and not other than, the jurisdiction for suits by or against banks not organized under any law of the United States which do or might do banking business where such national banking association may be doing business when such suits may be begun: and all laws and parts of laws of the United States inconsistent with this proviso be, and the same are hereby, repealed." Proviso to section 4, Act of July 12, 1882, c. 290, 22 Stat. 163 [U. S. Comp. St. 1901, p. 3458].

"That all national banking associations established under the laws of the United States shall, for the purpose of all actions by or against them, real, personal, or mixed, and all suits in equity, be deemed citizens of the states in which they are respectively located; and in such cases the circuit and district court shall not have jurisdiction other than such as they would have in cases between individual citizens of the same state. The provisions of this section shall not be held to affect the jurisdiction of the courts of the United States in cases commenced by the United States or by direction of any officer thereof, or cases for winding up the affairs of any such bank." Act of Aug. 13, 1888, c. 866, § 4, 25 Stat. 436 [U. S. Comp. St. 1901, p. 514].

Section 2 of the act of June 30, 1876, was not repealed either by the act of July 12, 1882, or by the judiciary act of August 13, 1888. The former authorizes suits against shareholders for the enforcement of their statutory liability, while the two latter relate exclusively to suits by or against the banking associations themselves. These subject-matters, while closely related, are in a legal sense quite different. But even if the later acts could be said to cover in a general way the purpose of the first, nevertheless, under well-known rules of statutory construction, the law prescribing the special remedy in a particular case would stand unrepealed. That it is still in force and operative has been judicially recognized. Commercial Nat. Bank v. Weinhard, 192 U. S. 243, 250, 24 Sup. Ct. 253, 48 L. Ed. 425; McDonald v. Thompson, 184 U. S. 71, 75, 22 Sup. Ct. 297, 46 L. Ed. 437; King v. Pomeroy, 121 Fed. 287, 58 C. C. A. 209; Williamson v. Bank, 115 Fed. 793, 52 C. C. A. 1.

Prior to the act of July 12, 1882, relating to national banking associations, the Circuit Courts of the United States had general cognizance of suits by or against national banks, but by the proviso of section 4 of that act such banks were placed, for purposes of jurisdiction, in the category of domestic corporations of the states in which they were respectively located, with an exception as to "suits between them and the United States or its officers and agents." This proviso was excerpted from the act of 1882, and embodied, with some change of phraseology, in section 4 of the judiciary act of March 3, 1887, and of the corrective act of August 13, 1888, the exception being expressed as follows:

"The provisions of this section shall not be held to affect the jurisdiction of the courts of the United States in cases commenced by the United States or

by direction of any officer thereof or cases for winding up the affairs of any such bank."

Cases of the latter character were not in terms excepted from the prohibition of the act of 1882. It seems clear that section 4 of the act of 1888 was intended to displace and to be a substitute for the proviso of section 4 of the earlier act.

It was not the purpose of Congress, by either of these acts, to wholly deprive the Circuit Courts of jurisdiction of suits by or against national banks arising from the subject-matter thereof. A suit which may be brought in a Circuit Court by or against a citizen of a state because it arises under the Constitution, laws, or treaties of the United States may for the same reason be brought in such court by or against a national bank located in the same state. Petri v. National Bank, 142 U. S. 644, 647, 12 Sup. Ct. 325, 35 L. Ed. 1144. All that was intended was that jurisdiction should no longer be asserted solely on the ground of the federal origin of such banks—merely because of the source of their incorporation. In respect of jurisdiction they are to be considered as though they were organized under the laws of the states in which they are respectively located.

So far, therefore, as the case at bar may be considered as one to enforce the liability of the stockholders of a national bank which has gone into voluntary liquidation, the jurisdiction of the Circuit Court is sustained by section 2 of the act of June 30, 1876.

But a broader and more satisfactory ground may be found in the provisions of the act of August 13, 1888. Section 1 of that act in general terms confers jurisdiction of causes arising under the laws of the United States, while those which are brought to wind up the affairs of national banks are expressly excepted from the prohibitions of section 4.

A suit against an insolvent national bank which has gone into voluntary liquidation to enforce a specific lien, or to enforce and judicially administer a trust previously created by contract, or to enforce and judicially administer the trust arising from the insolvency and proceedings in liquidation, is a suit arising under the laws of the United States. It is also a suit to wind up the affairs of such bank. The same is true of a suit to enforce the liability of the stockholders of such a bank. In Guarantee Co. v. Hanway, 104 Fed. 369, 44 C. C. A. 312, it was held by this court that an action to recover a judgment against an agent selected by the stockholders of a national bank to succeed a receiver appointed by the Comptroller of the Currency, and to enforce the same against the assets of the bank, is in effect a case to wind up its affairs, under section 4 of the act of 1888. This case was followed in International Trust Co. v. Weeks (C. C.) 116 Fed. 898, a suit to recover on a covenant in a lease from an agent appointed by the stockholders of a national bank to close its affairs. On appeal the jurisdiction of the court was upheld by virtue of section 4 of the act of 1888. Weeks v. Trust Co., 125 Fed. 379, 60 C. C. A. 236. See, also, Snohomish County v. National Bank (C. C.) 81 Fed. 518, which was a suit to enjoin the stockholders' agent, engaged in winding up the affairs of the bank, from proceeding further, and to procure the appointment of a receiver to take charge of the remaining assets.

The tangible assets of an insolvent national bank which is in the process of liquidation constitute, in the hands of the liquidating agent, a trust fund for the primary benefit of creditors, and so of the liability of the shareholders of a bank similarly circumstanced.

In King v. Pomeroy, supra, it was said that the enforcement of the liability of the stockholders of a national bank in process of liquidation and the distribution of the proceeds "is as much a part of the liquidation of the debts of the bank as the collection and distribution of the proceeds of its bills receivable or any other of its assets." There is no sound reason why, at the suit of one or more creditors on behalf of all for the winding up of the affairs of the bank, there may not be had, if so desired, a complete judicial administration of the affairs of the bank, an ascertainment of the valid and subsisting claims against it, an enforcement of the trusts in respect of both the assets and the capital stock, and, finally, the distribution of the avails. Nor would a bill for such comprehensive relief be multifarious. Richmond v. Irons, 121 U. S. 27, 7 Sup. Ct. 788, 30 L. Ed. 864. All of these results are accomplished in an involuntary proceeding in liquidation under the direction of the Comptroller of the Currency, which is said to constitute but one continuous transaction; and, as was observed by the Supreme Court:

"When in the case of voluntary liquidation the proceeding is instituted by one or more creditors for the benefit of all, by means of the jurisdiction of a court of equity, there seems to be no reason why the nature of the proceeding should be considered as changed. * * * The two subjects of applying the assets of the bank and enforcing the liability of the stockholders, however otherwise distinct, are by the statute made connected parts of the whole series of transactions which constitute the liquidation of the affairs of the bank." Richmond v. Irons, supra.

It was not essential to the maintenance of the suit in the court below that the complainant should have first reduced his demand to judgment. The debtor bank was insolvent and had gone into voluntary liquidation. The complainant, a contract creditor, asserted a lien by way of pledge upon all of the undisposed assets of the bank and sought the establishment of his claim. All of such assets had been placed in the hands of a defendant, who, by express contract, was constituted a trustee for the primary benefit of the Union National, which became a creditor by the assumption and payment of the demands of all of the other creditors of the bank; and the complainant, as an assignee of the Union National, sought the enforcement of the trust thereby created. The defendant, who was trustee under the contract, was also the liquidating agent or trustee by virtue of his selection and appointment by the stockholders acting in the liquidation proceedings.

A suit for the enforcement of a lien or for the enforcement and administration of a trust is one peculiarly of equitable cognizance, and may be maintained by a contract creditor whose demand has not been reduced to judgment. Day v. Washburn, 24 How. 352, 16 L. Ed. 712; Case v. Beauregard, 101 U. S. 688, 25 L. Ed. 1004; Townsend v. Vanderwerker, 160 U. S. 171, 178, 16 Sup. Ct. 258, 40 L. Ed. 383; Clews v. Jamieson, 182 U. S. 461, 478, 21 Sup. Ct. 845, 45 L. Ed. 1183. In Oelrichs v. Spain, 82 U. S. 211, 21 L. Ed. 43, the court said that whenever an element of trust existed jurisdiction in equity was always

conferred. In these respects the case at bar differs from those cited by the appellants. Jones v. Green, 68 U. S. 330, 17 L. Ed. 553; Smith v. R. Co., 99 U. S. 398, 25 L. Ed. 437; Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Nat. Tube Works Co. v. Ballou, 146 U. S. 517, 13 Sup. Ct. 165, 36 L. Ed. 1070; Hollins v. Brierfield Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113. In the first three of these cases the absence of a lien was especially noticed, and in the last the absence of both a lien and an enforcible trust. It is no doubt true that the mere insolvency of a corporation will not in itself justify the maintenance of a suit in equity by a simple contract creditor, and that the trust which is frequently spoken of as arising from that condition is not an express trust which attaches to the property of the insolvent for the direct benefit of the creditor, but is merely one sub modo, which is recognized in the judicial administration of the affairs of the insolvent corporation. But when insolvency is accompanied, as in this case, by a conveyance of assets to a trustee and a pledge thereof for the benefit of creditors, and this is followed by affirmative proceedings in liquidation especially authorized by law and the selection by the shareholders of the same trustee as their liquidating agent, an express trust does attach to the assets of the insolvent corporation for the direct benefit of the creditors. Such a lien may be enforced and such a trust may be judicially administered at the suit of a simple contract creditor, and a court having lawfully acquired jurisdiction may, to give complete relief, proceed with the enforcement of the liability of the shareholders. Richmond v. Irons, supra; King v. Pomeroy, supra. In this connection it may be observed that while in section 1 of the act of 1876 it is expressly provided that a creditor who is entitled to call upon the Comptroller of the Currency to institute involuntary proceedings against a national bank must have reduced his demand to judgment, by section 2 "any creditor" may file a bill against the shareholders of a bank in voluntary liquidation.

It is contended that in making the contract, executing the notes, and transferring its assets the American National transcended its corporate powers, and that no debt was thereby created which could be enforced against its shareholders. Ward v. Joslin, 186 U. S. 142, 22 Sup. Ct. 807, 46 L. Ed. 1093. We may at the outset omit any consideration of what might be the case were these transactions dependent alone upon the authority of the officers and board of directors of the bank, for the evidence shows clearly that what was done by them was ratified and confirmed by the shareholders. The contract of December 21, 1895, was executed by Thomas L. Kimball as president of the American National pursuant to the instruction of a resolution of its board of directors. At the annual meeting of the shareholders held January 14, 1896, at which 1,665 out of a total of 2,000 shares of stock were represented, the contract was read, and an explanation made by the president of the condition of the bank which led up to and made its execution necessary. This was followed at the same meeting by the adoption of a resolution, by the votes of those representing more than 1,600 shares of stock, instructing the directors to take action looking to the liquidation of the bank. Pursuant to this resolution another meeting of the shareholders was held February 25, 1896, 1,696 shares

being represented, at which a formal resolution for liquidation in accordance with sections 5220 and 5221 of the Revised Statutes was adopted by a vote of those owning 1,639¾ shares, being some 300 more than were necessary under the law. In this resolution it was provided that "Thos. L. Kimball be and he is hereby appointed the agent and trustee of the shareholders of such bank to effect such liquidation." The significance of this appointment is apparent when it is recalled that Kimball was also designated as the agent or liquidating trustee in the contract of December 21, 1895. Another shareholders' meeting was held January 12, 1897, at which 1,531 shares were represented, and at this meeting there was presented a comparative statement over the signature of Thomas L. Kimball, trustee, showing the condition of the bank on December 21, 1895, when the contract was made, and on January 1, 1897. It included an account of transactions during the progress of the liquidation, and an expression of views as to the best course to be pursued with reference to the remaining assets. Reference was definitely and explicitly made in this statement to the Union National and to the payment to it of proceeds of collections which had been made by the trustee. It was ordered to be spread upon the records of the bank. Shortly after the execution of the contract of December 21, 1895, and before the adoption of the resolution for liquidation, a writing containing an express ratification of the action of the directors in respect of the contract between the two banks was executed by the owners of more than two-thirds of the stock of the American National. At no meeting of the shareholders, so far as the record shows, was there any word of criticism or objection to the transaction with the Union National except so far as it may be gathered from the mere fact that a small number of shares were voted against the resolution for liquidation. When it is considered that the Union National was engaged in carrying out its part of the contract, was disbursing its funds in taking up and caring for the contracts, debts, and engagements of the American National, the duty of the shareholders of the latter in meeting assembled to then repudiate the transaction, if they ever desired to do so, was imperative. Instead of so doing they supplemented the transaction with the Union National by proceedings in voluntary liquidation adopted by a vote largely in excess of that required by law and conducted such liquidation in connection with and as part of the performance of the contract of December 21, 1895. Every consideration of equity, good conscience, and justice leads to the conclusion that the shareholders should be held to have ratified and approved of what was done and what was then being done.

So far as the Union National was concerned the transaction between the two banks was in the exercise of its ordinary powers as a banking association. Schofield v. Bank, 97 Fed. 282, 38 C. C. A. 179. When the contract was entered into the American National was confronted by an emergency. A withdrawal from the bank of a large amount of deposits was anticipated, and it had not the money or available cash resources to meet it and thereafter continue business. At the time, as subsequent experience demonstrated, the bank was in fact hopelessly insolvent. But in the light of the conditions which were known it was within the power of the officers and directors of that bank to make the

contract of December 21, 1895, with the approval of the shareholders owning a larger proportion of the capital stock than was necessary under the law in case of a voluntary liquidation.

The expression "usual course of business" as one of limitation upon the powers of a corporation is generally referable to the activities of a going concern, and has little, if any, application to one which is upon the threshold of liquidation because of insolvency. In the latter condition the managing officers of a corporation, with the approval of the shareholders, may make any fair and equitable disposition of its assets which, not being in violation of any provision of law, will insure the payment of all of its debts and is reasonably calculated to preserve the largest equity for its shareholders. In such an emergency a corporation should not be held to be helpless and incapable of an act of duty to creditors, and of preservation of the interests of its shareholders merely because it may be outside of the usual routine or course of its business.

In the case at bar all of the obligations of the American National to the government were fully performed, no duty was omitted which called for the interposition of the Comptroller of the Currency, and no federal statute was violated. Upon insolvency and the institution of proceedings in liquidation the assets of a national bank stand pledged by law to the payment of the debts, and the surplus, if any, to a ratable distribution among the shareholders. The contract which is attacked by the appellants was intended to accomplish nothing substantially different. Instead of many creditors to be dealt with, it was arranged that there should be one whose demands should embrace those of all of the others. And in considering the relation of the Union National and the complainant, its assignee, to the American National, we need not stop at the three notes which they hold. In the same sense that a shareholder may go behind a judgment recovered against his corporation to show the character of the indebtedness which it represents, so in a case like the one in hand may a creditor, holding a note of the bank, show, if necessary, the nature of the debt which is evidenced thereby. In equity the claims of the complainant and the Union National represent the "contracts, debts, and engagements" of the American National for which the stockholders of the latter are responsible in accordance with the provisions of section 5151 of the Revised Statutes [U. S. Comp. St. 1901, p. 3465].

The complaint made on behalf of some of the appellants on account of the computation of interest upon the claims of the creditors was not made the subject of an assignment of error, and is therefore not considered.

The decree of the Circuit Court is affirmed.